477 F.2d 526
 James BROWN and Rosa Lee Brown, Appellants,
v.
KENRON ALUMINUM AND GLASS CORPORATION, and Reynolds Aluminum
Credit Corporation, Appellees.
James BROWN and Rosa Lee Brown, Appellants,
v.
KENRON ALUMINUM AND GLASS CORPORATION, Appellee, and
Reynolds Aluminum Credit Corporation.
 No. 72-1304, 72-1437.
 United States Court of Appeals,
Eighth Circuit.
 Submitted March 13, 1973.
Decided April 20, 1973.
 
 Robert C. Oberbillig, Des Moines, Iowa, for appellants.
 Donald A. Wine, Des Moines, Iowa, for appellee Reynolds.
 Before MATTHES, Chief Judge, and ROSS and STEPHENSON, Circuit Judges.
 MATTHES, Chief Judge.
 
 
 1
 These appeals serve to highlight again the narrow range of remedies often afforded unwitting consumers by state law.
 
 
 2
 James Brown and his wife, Rosa Lee Brown, plaintiff-appellants, signed a contract in December of 1964 in which they agreed to purchase aluminum siding and four aluminum doors for their home from defendant-appellee Kenron Aluminum and Glass Corporation (Kenron). The contract recited a cash sale price of $2,998 payable in an undesignated number of monthly installments of $55.70. At the same time, appellants completed a credit application, which Kenron subsequently submitted to defendant-appellee Reynolds Aluminum Credit Corporation (Reynolds), a wholly-owned subsidiary of Reynolds Metals Company organized for the purpose of extending long-term credit to selected home improvement dealers. The record reveals that apart from Reynolds, Kenron also financed its customers through several local banks. Reynolds approved appellants' credit application and notified them that the "unpaid cash balance" of $2,998 was "payable in 84 monthly installments of $55.68." Appellants were not informed that 84 monthly installments of $55.68 equaled a time price of $4,677.12, in comparison to the quoted cash price of $2,998.
 
 
 3
 At the time of the signing of the contract, Mr. Brown, whose schooling was limited to the first grade, worked as a night watchman at Camp Dodge at a wage of $283 a month. Mrs. Brown earned $200 a month working in a rest home. They lived with Mrs. Brown's five children in a $3,000 home they were purchasing under a real estate contract calling for monthly payments of $55. According to appellants, they understood the home improvement contract to provide for installation of four doors and fourteen windows at an approximate cost of $1,000. When they were informed that instead they had signed a contract for siding and doors at a cash price of $2,998, they allegedly sought the advice of several persons who told them "there was nothing they could do but try to pay it off as best they could."
 
 
 4
 After Reynolds approved appellants' credit application, Kenron proceeded to remove the original slate siding from the Brown home and install the aluminum siding and doors. On February 17, 1965, Mrs. Brown signed a completion certificate. On that same date, both appellants executed a promissory note in the amount of $4,677.12, payable in 84 monthly installments of $55.68. And in order to secure the note, they also executed a real estate mortgage on their home. Reynolds purchased the promissory note and mortgage from Kenron on February 23.
 
 
 5
 From March, 1965 through June, 1966, appellants regularly paid monthly installments on the promissory note to Reynolds. During this period of time Mrs. Brown registered several complaints with Reynolds as to the application of the siding and incompletion of the work. The record shows that Reynolds relayed these complaints to Kenron, and that, on at least one occasion, Kenron made a service call. After June, 1966, appellants fell in arrears on the note, and Reynolds referred the Brown account to an attorney, George G. West. At about the same time, Reynolds purchased the vendor's interest in appellants' real estate contract, allegedly in order to protect Reynolds' security interest in the property. As payments were overdue on the real estate contract when it was acquired by Reynolds, it too was referred to West for collection. Between January 12, 1967, and March 11, 1968, appellants paid West $1,025, of which he applied $348.88 to the real estate contract and $676.12 to the note. On April 5, 1968, an additional $50 was paid by money order. The record does not reveal to which account this last payment was credited. On March 11, 1968, the balance due on the real estate contract was $975.92, and the balance due on the promissory note was $3,167.81.
 
 
 6
 On May 28, 1968, West served notice of forfeiture of the real estate contract and, on July 1, notice to vacate the premises. Suit for possession was filed on July 22 and later dismissed for improper service of process.
 
 
 7
 This diversity action was instituted by appellants against Kenron and Reynolds in state court on August 6, and removed by Reynolds to the United States District Court, Southern District of Iowa.
 
 
 8
 On August 9, 1968, Reynolds filed anew its suit for possession in the state court. That court, however, entered a stay pending the outcome of this action, upon the condition that appellants pay $75 monthly to the court. As of March 29, 1972, appellants had paid $3,009.50 to the state court pursuant to its order.
 
 
 9
 Appellants' amended complaint filed October 3, 1968, accused Kenron of fraudulent misrepresentation, breach of contract, usury, and unconscionability of contract. Reynolds was charged with fraud, conspiracy to defraud, liability of a principal for acts of its agent, usury and credit harassment.
 
 
 10
 In response to the amended complaint, defendants filed a motion to dismiss or, in the alternative, for a more definite statement. The trial court, on February 6, 1969, dismissed the usury claims on the ground that they had been improperly pleaded under Iowa law. Otherwise, defendants' motion was denied.
 
 
 11
 On March 12, 1970, appellants filed a pleading denominated "statement of damages" setting forth specific elements claimed as damages. The claims for relief against each defendant sought compensatory damages for payments made to Reynolds on the promissory note, costs of repairs, the difference between heating bills prior to and after the application of the siding, mental anguish and distress, credit harassment, attorney fees and expenses, and costs of the action. In addition, in Count VI of their amended complaint appellants sought rescission of the contract contained in Exhibit B (real estate contract). Also under each count, appellants requested punitive damages in the sum of $50,000 for the wanton, willful and reckless conduct of the defendants.
 
 
 12
 On February 3, 1971, the trial court filed an order permitting Kenron's attorney, George West, to withdraw as counsel on the ground that he would be called as a witness in the action. The order also provided that if new counsel failed to enter an appearance within fifteen days, Kenron would be in default without further notice. An attorney for the trustee of the bankruptcy estate of Kenron, which was pending at that time in the Northern District of Illinois, advised the court that Kenron would not appear and defend. Thereafter, a judgment of default was entered against Kenron and in favor of appellants in the sum of $6,400 plus interest.
 
 
 13
 Reynolds, however, vigorously contested the action.
 
 
 14
 On May 19, 1972, the trial court filed a memorandum and order finding Reynolds free from fraud or knowledge of fraud. Nor was there any evidence, the court held, that Kenron acted as an agent for Reynolds, that both had conspired to defraud appellants, or that Reynolds or West exceeded their legal rights in attempting to collect payments. The court also declared the real estate contract free of infirmity and, accordingly, refused appellants' request for its rescission.
 
 
 15
 Having been granted leave to proceed in forma pauperis by the district court, appellants filed timely appeals from both judgments.
 
 
 16
 On appeal from the judgment in favor of Reynolds, appellants assert that the court erred in construing the pleadings to request rescission of the real estate contract rather than the rescission of the home improvement contract.
 
 
 17
 On appeal from the default judgment against Kenron, appellants argue that the court erred in not making a finding of fraud on the part of Kenron.
 
 I. No. 72-1304
 
 18
 As a preliminary matter, we note that the complaint and other pleadings filed in this case by counsel for appellants are replete with ambiguity, repetition, and inartful phrasing. However, under any possible construction of the pleadings, we are soundly convinced that the judgment of the trial court in favor of Reynolds was proper.
 
 
 19
 Appellants do not suggest that there was any fraud exercised in the procurement of the promissory note and real estate mortgage, the only instruments which were eventually negotiated to Reynolds. Nor have appellants satisfactorily proved the existence of an agency or conspiracy between Kenron and Reynolds. Appellants' theory that Kenron acted as an agent for Reynolds is premised primarily on the fact that only Reynolds, of the several financing institutions available to Kenron, offered the seven year plan extended to appellants. However, this circumstance, in and of itself, is not sufficient to negative the independent status of Reynolds, particularly when Reynolds retained the option of rejecting the credit transaction, and Kenron furnished its own forms and utilized several financing institutions. See United States v. Tholen, 186 F.Supp. 346 (N.D.Iowa 1960). In short, there is absolutely no ground upon which to rescind the home improvement contract or to bottom Reynolds' liability for fraud, either directly or derivatively.[1]
 
 
 20
 Appellants reach a contrary conclusion by apparently reasoning that Reynolds should be held strictly liable for defects in the obligation underlying the negotiated instruments. Appellants have not directed us, however, to any cases so holding, nor were we able to discover any by means of our own research. We emphasize the distinction, however, between this case and one where the negotiated instruments themselves are defective. See Millrose Corp. v. Brent, 106 U.S.App.D.C. 242, 271 F.2d 508 (1959). Here, the negotiated instruments were admittedly free of infirmity.
 
 
 21
 Appellants also dispute the trial court's finding that Reynolds did not engage in credit harassment. Appellants urge that West, Reynolds' attorney, deliberately treated appellants' payments on the real estate contract as payments on the promissory note, thereby insuring that appellants' property would continually remain subject to forfeiture. There existed, however, a conflict in the evidence as to the understanding between West and appellants. Moreover, since Reynolds had purchased a mortgage on appellants' property as security for the promissory note prior to obtaining the real estate contract, it is difficult to understand what advantage effectively accrued to Reynolds by applying payments to one obligation or the other. We conclude that there was ample support for the finding of the trial court that West and Reynolds did not exceed their legal collection rights.
 
 
 22
 In the final analysis the bases for appellants' claims against Reynolds presented issues of fact. The seasoned district judge, after a plenary trial and consideration of the voluminous documents, found that appellants had failed to sustain their burden of proving any of their claims for relief. We are satisfied the court's findings are not clearly erroneous.
 
 II. No. 72-1437
 
 23
 In appealing from the default judgment against Kenron, appellants complain of the failure of the trial judge to make a finding of fact as to the alleged fraud of Kenron.
 
 
 24
 The memorandum and order of the trial court reads in pertinent part as follows:
 
 
 25
 "The Court finds that the plaintiffs in the above-entitled cause of action entered into a contract with the defendant Kenron on or about December 21, 1964, for aluminum siding, aluminum windows and aluminum doors for plaintiffs' house. Defendant Kenron subsequently caused such materials to be fixed to plaintiffs' house but subsequently, the materials proved to be defective and worthless. Default has been previously entered against defendant Kenron and the issues of liability cannot now be contested. Accordingly, the Court makes no independent finding of any fraud, misrepresentation, or malice on the part of Kenron.
 
 
 26
 The Court finds that Kenron received $4,600.00 from plaintiffs for work done in supplying and installing the above described materials. The Court further finds that the present value of these materials is nothing, and that it would take $1,800.00 to place adequate siding on the house.
 
 
 27
 Accordingly, the Clerk shall enter judgment against Kenron Aluminum and Glass Corporation and in favor of plaintiffs for $6,400.00 plus interest from the date of trial of this action.
 
 
 28
 The parties shall bear their own costs.
 
 
 29
 It Is Further Ordered that the foregoing memorandum shall constitute the findings of fact and conclusions of law in this case with respect to Kenron Aluminum and Glass Corporation in accordance with F.R.C.P. 52(a)."
 
 
 30
 Rule 52(a) requires findings of fact "in all actions tried upon the facts without a jury or with an advisory jury . . ." A default judgment, however, generally precludes a trial of the facts, except as to damages.
 
 
 31
 "A hearing to determine whether to enter judgment by default [pursuant to Rule 55] is not considered as a trial. If the court determines that the defendant is in default, his liability to the plaintiff is deemed established and the plaintiff is not required to establish his right to recover. The allegations of the complaint except as to the amount of damages are taken as true. If the default is established, the defendant has no further standing to contest the merits of plaintiff's right to recover. His only recourse is to show good cause for setting aside the default and, failing that, to contest the amount of the recovery."
 
 
 32
 3 Barron & Holtzoff, Federal Practice & Procedure Sec. 1216, pp. 85-86 (1958). See cases collected in Annot., 8 A.L.R.3d 1070 (1966). A judgment by default is as conclusive an adjudication of the issues for purposes of res judicata as a judgment rendered after a trial on the merits. Riehle v. Margolies, 279 U.S. 218, 225, 49 S.Ct. 310, 73 L.Ed. 669 (1929). The allegations of the complaint, in effect, become findings of fact. And, therefore, Rule 52 is inapplicable except as to damages.
 
 
 33
 Thus we hold that implicit in the judgment of default is a finding of fraud by Kenron.
 
 
 34
 Judgments affirmed.
 
 
 
 [1]
 A judgment in favor of Reynolds on appellants' complaint does not determine whether or not Reynolds would possess the status and rights of a holder in due course should that issue arise in a subsequent suit brought to enforce the promissory note. See Iowa Code Ann. Secs. 554.3302, 554.3305