In re URANIUM ANTITRUST
LITIGATION.

WESTINGHOUSE ELECTRIC
CORPORATION, Plaintiff,

v.

RIO ALGOM LIMITED, Rio Algom Corpo-
ration, Rio Tinto Zinc Corporation Lim-
ited, RTZ Services Limited, Rio Tinto
Zinc Corporation, Conzinc Rio Tinto of
Australia Limited, Mary Kathleen Ura-
nium Limited, Pancontinental Mining
Limited, Queensland Mines Limited, Nu-
clear Fuels Corporation, Anglo-Ameri-
can Corporation of South Africa, Limit-
ed, Engelhard Minerals and Chemicals
Corporation, Denison Mines, Limited,
Denison Mines (U.S.) Incorporated, No-
randa Mines Limited, Gulf Oil Corpora-
tion, Gulf Minerals Canada Limited,
Kerr-McGee Corporation, the Anaconda
Company, Getty Oil Company, Utah In-
ternational Inc., Phelps Dodge Corpora-
tion, Western Nuclear, Inc., Homestake
Mining Company, Atlas Corporation,
Reserve Oil and Minerals Corporation,
United Nuclear Corporation, Federal
Resources Corporation, and Pioneer Nu-
clear, Inc., Defendants.

MDL 342.

No. 76 C 3830.

United States District Court,
N. D. Illinois, E. D.

Jan. 3, 1979.

See also, D.C., 473 F.Supp. 393.

Roger P. Pascal, Schiff, Hardin & Waite, Chicago, Ill., for the Anaconda Co.

Gregory A. Adamski, Winston & Strawn, Chicago, Ill., Michael V. Corrigan, Simpson, Thacher & Bartlett, New York City, for Atlas Corporation.

Richard L. Blatt, Peterson, Ross, Schloerb & Seidel, Chicago, Ill., Laurence V. Senn, Jr., Mudge, Rose, Guthrie & Alexander, New York City, for Denison Canada and Denison U. S.

Kenneth R. Gaines, Altheimer & Gray, Chicago, Ill., Raymond L. Falls, Jr., Cahill, Gordon & Reindel, New York City, for Engelhard Minerals.

Richard K. Decker, Lord, Bissel & Brook, Chicago, Ill., Leonard J. Lewis, Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, Utah, for Federal Resources Corp.

James W. Hathaway, Burditt & Calkins, Chicago, Ill., Brenton F. Goodrich, Overton, Lyman & Prince, Los Angeles, Cal., for Getty Oil Co.

Jonathan G. Bunge, Keck, Cushman, Mahin & Cate, Chicago, Ill., Richard T. Colman, Howrey & Simon, Washington, D. C., for Gulf Oil Corporation and Gulf Minerals Canada, Ltd.

J. Craig Busey, McDermott, Will & Emery, Chicago, Ill., David M. Balabania, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., for Homestake Mining Co.

Thomas W. Johnston, Chadwell, Kayser, Ruggles, McGee & Hastings, Chicago, Ill., for Kerr-McGee Corp.

Joseph S. Wright, Jr., Rooks, Pitts, Fullagar & Poust, Chicago, Ill., for Noranda Mines Ltd.

John H. Hall, Debevoise, Plimpton, Lyons & Gates, New York City, for Phelps Dodge Corp. and Westernnuclear, Inc.

Thomas D. Allen, Wildman, Harrold, Allen & Dixon, Chicago, Ill., Andrew Barr, Locke, Purnell, Boren, Laney & Neely, Dallas, Tex., for Pioneer Nuclear, Inc.

Richard P. Campbell, McConnell & Campbell, Chicago, Ill., for Reserve Oil & Minerals Corp.

Paul G. Gebhard, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., Richard E. Sherwood, O'Melveny & Myers, Los Angeles, Cal., for RTZ Corp. of America.

Robert T. Johnson, Jr., Bell, Boyd, Lloyd, Raddad & Burns, Chicago, Ill., W. Perry Pearce, Bigbee, Stephenson, Carpenter & Crout, Santa Fe, N. M., for United Nuclear Corp.

Watson B. Tucker, Mayer, Brown & Platt, Chicago, Ill., for Utah International, Inc.

Keith F. Bode, Jenner & Block, Chicago, Ill., for Rio Algon Corporation.

Lee A. Freeman, Jr., Freeman, Rothe, Freeman & Saltzman, Chicago, Ill., Raymond F. Scannell, Asst. Gen. Counsel, Westinghouse Electric Corp., Pittsburgh, Pa., George S. Leisure, Jr., Donovan, Leisure, Newton & Irvine, New York City, for Westinghouse.

## MEMORANDUM DECISION

MARSHALL, District Judge.

On October 15, 1976, Westinghouse Electric Corporation filed this antitrust action

against twelve foreign and seventeen domestic corporations engaged in various aspects of the uranium industry. All defendants were duly served with a summons and a copy of the complaint. Nine foreign defendants [1] based in Canada, England, Australia and South Africa failed to appear and answer or otherwise plead to the complaint. On February 2, 1977, a default was entered against each of them under Rule 55(a), F.R. Civ.P. On August 19, 1977 Westinghouse made two requests designed to implement that default. First, it requested entry of a final default judgment as to liability against the nine defendants, pursuant to Rules 54(b) and 55(b). Second, it requested the entry of detailed findings of fact and conclusions of law in support of that judgment, pursuant to Rule 52(a). In support of each request it submitted detailed proposed findings and conclusions. The appearing defendants opposed both requests, characterizing them as unauthorized, improper, unnecessary and prejudicial. The issues have been extensively briefed. We grant Westinghouse's first request but deny the second.

## I. The Motion for Entry of Final Default Judgments

The leading case on the propriety of a default judgment against fewer than all of the defendants in an action is *Frow v. De La Vega*, 15 Wall. 552, 82 U.S. 552, 21 L.Ed. 60 (1872). De La Vega sued Frow and thirteen other defendants in federal court claiming that Frow and seven of his codefendants jointly had conspired to defraud him out of a tract of land by using forged and spurious documents. All the defendants answered the complaint, except Frow. The trial court entered a "decree *pro confesso*" against him. More than a year later, on plaintiff's motion and over Frow's objection and motion for leave to file an answer, the court entered a "final decree absolute" against Frow, declaring that title to the land belonged to plaintiff and awarding a permanent injunction against Frow.

Following this decree, the court proceeded to try the merits of the action as to the remaining defendants, held in favor of those defendants, and dismissed the complaint as to them.

On Frow's appeal from the final decree entered against him, the Supreme Court reversed. The Court was troubled by the "absurd" inconsistency between the two decrees, which alternatively sustained and rejected plaintiff's claim of a joint fraud. To avoid this incongruous result, the Court ruled that:

> The true mode of proceeding where a bill makes a joint charge against several defendants, and one of them makes default, is simply to enter a default and a formal decree *pro confesso* against him, and proceed with the cause upon the answers of the other defendants. The defaulting defendant has merely lost his standing in court. He will not be entitled to service of notices in the cause, nor to appear in any way. He can adduce no evidence, he cannot be heard at the final hearing. But if the suit should be decided against the complainant on the merits, the bill will be dismissed as to all the defendants alike—the defaulter as well as the others. If it be decided in the complainant's favor, he will then be entitled to a final decree against all. But a final decree on the merits against the defaulting defendant alone, pending the continuance of the cause, would be incongruous and illegal.

82 U.S. at 554. If, then, the alleged liability is "joint," a "final decree" should not be entered against a defaulting defendant until all of the defendants have defaulted, or until the case is tried as to the remaining appearing defendants. In the present case, the appearing defendants contend that the *Frow* rule prohibits the entry of a default judgment against any of the defaulting defendants until a trial is held on the merits.

Application of the *Frow* rule to the present case presents two interpretive prob-

1. Rio Algom Ltd., Rio Tinto Zinc Corp., Ltd., RTZ Services, Ltd., Conzinc Rio Tinto of Australia, Ltd., Mary Kathleen Uranium, Ltd., Pancontinental Mining, Ltd., Queensland Mines, Ltd., Nuclear Fuels Corp., and Anglo-American Corporation of South Africa, Ltd.

lems. The first is created by the Court's use of now-obsolete terminology. The Court approved the entry of "a default and a formal decree *pro confesso*," but not a "final decree," against the defaulting defendant. If, as Westinghouse argues, a "formal decree *pro confesso*" is the equivalent of the modern Rule 55(b) default judgment as to liability, then its motion is well taken. If, however, a "formal decree *pro confesso*" is the equivalent of the modern Rule 55(a) entry of default, and the Court intended by its prohibition of a "final decree" to prohibit the equivalent of a modern default judgment, then *Frow* seems to require that the motion be denied. The second interpretative problem is to define the language which states that the rule is to apply "where the bill makes a joint charge against several defendants." We must determine what the Court meant by using the term "joint" liability, and whether the Westinghouse complaint raises comparable allegations.

We direct our attention first to an examination of the antiquated equity language concerning default decrees. The *Frow* procedure endorsed the entry of a "formal decree *pro confesso*" but proscribed a "final decree on the merits." The distinction between these two decrees was elucidated in *Thomson v. Wooster*, 114 U.S. 104, 109–14, 5 S.Ct. 788, 29 L.Ed. 105 (1885). Although in *Thomson* Justice Bradley (who also authored *Frow*) employed a somewhat different terminology, and described the difference between "an order taking a bill *pro confesso*" and a "decree *pro confesso*," the corresponding effect of the two steps were the same.

> We may properly say, therefore, that to take a bill *pro confesso* is to order it to stand as if its statements were confessed to be true; and that a decree *pro confesso* is a decree based on such statements, assumed to be true . . . and such a decree is as binding and conclusive as any decree rendered in the most solemn manner. "It cannot be impeached collaterally, but only upon a bill of review, or [a bill] to set it aside for fraud."

114 U.S. at 111–12, 5 S.Ct. at 792. He later compared these definitions to corresponding sections of the then-extant Federal Equity Rules. Thus, the 18th Rule governed the taking of a bill *pro confesso* and provided that if the defendant failed to make a timely response to the complaint, the plaintiff "may at his election, enter an order (as of course) in the order book, that the bill be taken *pro confesso*, and thereupon the cause shall be proceeded in *ex parte*" and the matter of the bill may be decreed by the court after the expiration of thirty days, if appropriate. Then the 19th Rule "declare[d] that the decree rendered upon a bill taken *pro confesso* shall be deemed absolute . . . ." *Id.*

These two rules in turn corresponded to Rules 16 and 17 of the Equity Rules of 1912, the direct precursors of today's Rule 55. 10 Wright & Miller, Federal Practice & Procedure: Civil, § 2681 at p. 247 (1973); 6 J. Moore, Federal Practice, ¶ 55.02[2] (2d ed. 1976). Rule 16 tracked the 18th Rule as described by Justice Bradley and referred to that procedure as a "decree *pro confesso*." Rule 17 tracked the language of the 19th Rule and designated the described decree as a "final decree."

■ We now match the forerunner Equity Rules with their counterparts in current Rule 55, which governs defaults. The general effect of the entry of default under Rule 55(a) is that of taking a bill *pro confesso* under the 18th Rule, or the entry of a decree *pro confesso* under Rule 16. 6 J. Moore *supra*, ¶ 55.03[2] (2d ed. 1976). In each case, the defaulting defendant loses his standing to defend on the merits, but there is no res judicata or collateral estoppel effect from the order because it is not a final adjudication. *Clifton v. Tomb*, 21 F.2d 893, 897 (4th Cir. 1927). This is the procedure referred to in *Frow* when the Court authorized the entry of a default and a "formal decree *pro confesso*" against Frow. As the Court noted, these orders merely deprived the defaulting defendant of his standing in court, his right to receive notice of the proceedings, and his right to present evidence at the final hearing. This is noth-

ing more than the entry of a default under Rule 55(a).

By contrast, the general effect of the entry of a default judgment under Rule 55(b) is that of the absolute decree under the 19th Rule, or the final decree under Rule 17. The judgment or decree is binding and conclusive on the parties to it, the principles of res judicata and collateral estoppel apply, and the order cannot be collaterally attacked except for fraud or want of jurisdiction. 6 J. Moore, *supra*, ¶ 55.09. It is clear that this procedure is the one described in *Frow* as the "final decree absolute" in the statement of facts, and as the "final decree on the merits" in the body of the opinion. These designations mirror the language used in the 19th Rule and Rule 17. Therefore, we conclude that, contrary to Westinghouse's argument, the *Frow* rule does prohibit the entry of a default judgment as to liability against fewer than all of the defendants in a case where other defendants appear and defend, assuming that the requisite joint liability is present.

The second interpretive problem is to define what degree of joint liability must be alleged before the *Frow* rule becomes applicable. In its opinion, the Court merely stated that the rule applies "where a bill makes a joint charge against several defendants." In that case, the eight defendants were charged with a "joint conspiracy to defraud" plaintiff out of a tract of land. The Court's opinion does not define "jointness" with any greater precision.

Seizing upon this explanatory vacuum and the literal language of the opinion, Westinghouse argues that the *Frow* rule only applies to cases of pure joint liability, not joint *and several* liability. Under this interpretation, the rule bars a default judgment if the liability of the defaulting defendant necessarily depends upon the liability of the remaining defendants. On the other hand, *Frow* permits a default judgment if the defaulting defendant may be found independently liable, regardless of the liabilities of the others. Westinghouse calls the first situation "joint" liability, calls the second situation "joint and several" lia-

bility, and then puts its complaint in the latter category.

This reading of *Frow* has received support from several courts. *See International Controls Corp. v. Vesco*, 535 F.2d 742, 746–47 n.4 (2d Cir. 1976); *Redding & Co., Inc. v. Russwine Construction Corp.*, 150 U.S.App. D.C. 93, 97, 463 F.2d 929, 933 (1972); *Exquisite Form Industries, Inc. v. Exquisite Fabrics of London*, 378 F.Supp. 403, 416 n.19 (S.D.N.Y.1974). Nevertheless, we believe this interpretation is erroneous, and rests on several fundamental misconceptions concerning the legal responsibility of multiple parties in tort actions.

The origin of the problem lies in the Supreme Court's use of the terms "joint charge" and "joint conspiracy" to characterize the *Frow* action. As Professor Prosser has noted, the related terms "joint tort" and "joint tortfeasor" have been surrounded by considerable uncertainty and confusion. Prosser, Law of Torts 291 (4th ed. 1971). Despite this semantic fog, however, one feature of a "joint tort" has long been settled: joint tortfeasors are jointly *and severally* liable. All might be joined together in the same action at law, but each is liable for the plaintiff's entire damages. This principle was first established at common law and continues in its basic form down to the present day. 1 Harper & James, The Law of Torts 692 (1956); Prosser, *supra* at 291–93; 59 Am.Jur.2d, Parties § 124 (1971). The classic examples of joint torts are cases in which several persons act pursuant to a common plan or design to commit a tortious act. *Id.* Both *Frow* and the present action fall within this class. *Frow* involved a conspiracy to defraud. The present case involves a conspiracy to violate the antitrust laws. It is generally recognized that a private antitrust action is a tort action, that antitrust coconspirators are joint tortfeasors, and that they are jointly and severally liable for the entire amount of damages caused by their acts. *Wainwright v. Kraftco Corp.*, 58 F.R.D. 9 (N.D.Ga.1973); *Washington v. American Pipe & Construction Co.*, 280 F.Supp. 802 (S.D.Cal.1968). Therefore, we believe that

despite the Court's use of a "joint" label to describe the *Frow* action, it falls within the basic paradigm for joint and several liability. The Westinghouse action is of the same genre.

■ With these two interpretive issues decided, we may restate the *Frow* rule in terms of modern federal procedure: where a complaint seeks to hold multiple defendants jointly and severally liable for tortious conduct, and fewer than all of them fail to answer or appear, the proper procedure is the entry of a default against them under Rule 55(a), but to withhold entry of a default judgment against them under Rule 55(b) until the case is tried on the merits. If we treat *Frow* as establishing a *per se* rule to this effect, Westinghouse's motion for entry of a default judgment must be denied. However, we find that changes in federal procedure which have occurred since 1872 require certain modifications of the *Frow* rule. Although we do not go so far as to suggest that *Frow* is now bad law, *see International Controls Corp. v. Vesco, supra,* 535 F.2d at 746 n.4, we believe that the intervening passage of Rule 54(b) of the Federal Rules of Civil Procedure dictates the use of a balancing test to determine the propriety of entering default judgments against fewer than all the defendants in multi-defendant actions.

■ Prior to the promulgation of the Federal Rules in 1938, the general rule in the federal courts was that a judgment was not final, and hence not appealable, if it disposed of less than all of the claims involved in the action, or it it terminated the action as to less than all the parties. This rule prohibiting piecemeal appeals of cases comprising a "single judicial unit" made sense when almost all federal litigation followed the two-party-single-claim model. 10 Wright & Miller, *supra,* § 2653; 6 J. Moore, *supra,* § 54.04[3.–2]. But the Federal Rules of Civil Procedure, with their liberal provisions for the joinder of claims and parties, greatly expanded the scope of a civil action. And they simultaneously increased the danger of hardship and injustice through delay in the disposition of a separable portion of a complex lawsuit. Consequently, Rule 54(b) was promulgated to facilitate the entry of judgments before all the rights of all the parties were finally adjudicated. 10 Wright & Miller, *supra,* § 2654; *Dickinson v. Petroleum Conversion Corp.,* 338 U.S. 507, 511, 70 S.Ct. 322, 94 L.Ed. 299 (1950).

Before 1961, Rule 54(b) permitted a district judge to direct the entry of judgment on fewer than all the claims in an action, if the judge expressly determined that there was "no just reason for delay." However, because the rule was silent on the entry of judgment as to fewer than all the parties, a controversy developed over whether the rule applied when multiple parties were jointly charged with a single claim. In 1955, the Ninth Circuit squarely faced the issue and held that it did not. *Steiner v. Twentieth Century-Fox Film Corp.,* 220 F.2d 105 (9th Cir. 1955).

The facts in *Steiner* bear some resemblance to the present case. The complaint charged six defendants with a conspiracy to violate the antitrust laws. Four defendants were dismissed prior to trial on their defense of the statute of limitations, but two other defendants remained in the action. The court of appeals dismissed plaintiff's appeal as to the four dismissed defendants for lack of finality, reasoning that Rule 54(b) applied only to multiple claims, not multiple parties, and that the conspiracy involved a single claim. The *Steiner* holding soon represented the weight of authority in the circuit courts. 6 J. Moore, *supra,* ¶ 54.34[2.–1] at p. 557; 10 Wright & Miller, *supra,* § 2654 at pp. 25–26.

In its Note to an amendment of 54(b), the Advisory Committee criticized these decisions which held "the rule to be inapplicable to the dismissal, even with the requisite trial court determination, of one or more but [fewer] than all defendants jointly charged in an action, i. e., charged with various forms of concerted or related wrongdoing or related liability." Noting that the danger of hardship through delay of appeal until the whole action is completed may be just as great in cases involving multiple parties as those involving multiple

claims, the Committee recommended an extension of the rule to multiple party litigation. That amendment was adopted in 1961.

Under the amended rule, a district court has a discretionary power to make final an adjudication that fully disposes of one or more but less than all of the parties. In exercising its discretion, the court must weigh the policy against piecemeal adjudication against the hardship and injustice which might result if the entry of final judgment and any review thereof were delayed until the case is completely terminated. The rule thus attempts to strike a balance between premature decision-making and the pragmatic needs of the litigants in complex multiple-party actions. To achieve this objective, it essentially regulates the *time* when district courts may enter final judgment.

The *Frow* decision also addressed the question of the time when district courts may enter final judgments in multiple-party actions. In that case, the district court entered a final default judgment against Frow. Frow appealed to the Supreme Court from that judgment. Subsequently, the trial court held a trial on the merits as to the remaining defendants and found in their favor prior to the Supreme Court's consideration of Frow's appeal. Although the Court reversed the Frow decree on the merits rather than dismissing Frow's appeal for lack of finality,[2] its decision is consistent with the historical judicial aversion to piecemeal adjudication and appeals in multiple party cases. Even under the present Rule 54(b), the Court would likely have reached the same result, since the speedy trial of the claims of the remaining defendants indicated that there was good reason to withhold Frow's default judgment for a short time until the entire case was decided. Under the present rule, it might have been an abuse of discretion for the trial court to forge ahead on Frow without a more realistic appraisal of the complexity, time requirements, and substantiality of the remaining action. Thus, although the Court rested its holding on the danger and actual presence of inconsistent judgments, its decision is also understandable in Rule 54(b) terms since there was an absence of competing hardships which could suggest a contrary result.

Besides Rule 54(b), there are other indications in the current federal rules that the policy against inconsistent judgments is to be weighed against a pragmatic consideration of hardship to existing parties in the litigation. Thus, Rule 19(a)(2)(ii) provides that, subject to service of process and jurisdictional requirements, absent persons who claim an interest relating to the subject of the action and whose absence may subject existing parties to a substantial risk of inconsistent obligations shall be joined as parties to the action. Nevertheless, Rule 19(b) provides that if it is not feasible to join such conditionally necessary persons, the action should be dismissed only if "equity and good conscience" counsel such a result. In applying this standard, the court is to consider several pragmatic factors, including the possibility of shaping relief to avoid prejudice to existing parties, and the adequacy of a judgment rendered in the person's absence (e. g., the advantages of according complete relief in a single action as weighed against the prejudice to the plaintiff and the waste of judicial resources which would result from denial of partial relief against the available parties). Although Rule 19 is probably inapplicable to the joint tortfeasor situation, *see* 3A, J. Moore, *supra,* § 19.07–2[3] at p. 19–148, n. 45, it provides indirect support for a rule which weighs the competing interests in cases involving segregable groups of present and absent defendants.

■ When we view the Westinghouse action against the entire historical mosaic created by *Frow* and the subsequent federal rules, and when we weigh the competing practical considerations against the Court's

2. As a practical matter, the Frow decree actually achieved finality some time between the filing of the appeal and later Supreme Court consideration, since the intervening trial as to the remaining defendants disposed of the entire action.

admonition against hasty default judgments, we conclude that entry of default judgments against the nine defaulting defendants is appropriate. Our reasons are several.

The complexity and size of this litigation is of a dimension wholly foreign to 19th century litigation, but expressly contemplated under the liberal Federal Rules of the 20th century. The numerous parties are multinational in character, the cases now span multiple federal districts, and the complaints implicate the pricing policies of a large segment of an entire industry. The expansive scope of modern civil actions such as this one requires an increased sensitivity to the need for partial final judgments. That need has been recognized in cases where, as here, a judgment is entered against some but not all defendants who are charged with conspiring to violate the antitrust laws. See Bogosian v. Gulf Oil Corp., 561 F.2d 434, 440–43 (3d Cir. 1977).

A final decision upon the claims made against the non-defaulting defendants will surely not be rendered for several years. In the interim, plaintiff faces the possibility that the defaulting defendants, which are all foreign corporations, may conceal or transfer their assets which are subject to execution by United States courts. Without a final default judgment entered against these defendants pursuant to Rule 54(b), plaintiff will be unable to procure a writ of execution to begin the process of collecting any subsequent damage award. See Redding & Co., Inc. v. Russwine Construction Corp., 135 U.S.App.D.C. 153, 159, 417 F.2d 721, 727 (1969); 10 Wright & Miller, supra, § 2661.

Furthermore, the seriousness of the charges in the complaint and the wilful and deliberate avoidance of those charges by the defaulting defendants require that they be held promptly accountable for their alleged actions, either through submission to damages or through an adjudication of the conclusiveness of the default judgment in a collateral proceeding. The defaults are not the result of inadvertence or excusable neglect. Frow's answer was delayed by "mis-understanding, sickness and other accidents" and he later sought leave to file it. By contrast, these defendants have chosen not to appear or answer the complaint in any manner whatsoever, despite ample opportunity to do so. Indeed, we are told that one of the defaulters directed its agent to destroy the copies of the summons and complaint by tearing up each page, which he did. Several others have been persistently uncooperative to Westinghouse's later subpoenas for testimony and documents needed in related litigation. See Haubold Affidavit.

■ The default judgment has been recognized as a significant procedural tool for enforcing compliance with rules of procedure, see Rule 37(d) and Bollard v. Volkswagen of America, Inc., 56 F.R.D. 569, 582–85 (W.D.Mo.1971), and for disciplining the obstructionist adversary who willfully ignores the processes of the court. 10 Wright & Miller, supra, § 2693 at 307–08, 315. As the Supreme Court recently emphasized, the default judgment, which is "the most severe in the spectrum of sanctions provided by statute or rule[,] must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but [also] to deter those who might be tempted to such conduct in the absence of such a deterrent." National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639, 643, 96 S.Ct. 2778, 2781, 49 L.Ed.2d 747 (1977).

Westinghouse's motion for entry of final default judgments on the issue of liability against the nine defaulting defendants is granted and judgment will enter pursuant to Rule 54(b), F.R.Civ.P.

## II. The Motion for Entry of Findings of Fact and Conclusions of Law in Support of the Default Judgment

■ As the second prong of its plan to implement the entry of default against the nine defendants, Westinghouse requests

that we issue detailed findings of fact and conclusions of law in support of the default judgment. Under Rule 8(d), F.R.Civ.P., the factual allegations of the complaint except as to the amount of damages were deemed admitted when these defendants failed to appear and answer the complaint. *Thomson v. Wooster, supra.* Those allegations, in effect, become findings of fact without a trial. *Brown v. Kenron Aluminum & Glass Corp.,* 477 F.2d 526, 531 (8th Cir. 1973). Hence, Rule 52(a), which requires findings of fact only in "actions tried upon the facts," does not impose such a requirement for default judgments except as to damages. *Id.* Nevertheless, Westinghouse correctly points out that Rule 52(a) does not prohibit such findings in other situations; it simply calls them "unnecessary." Westinghouse argues that district courts retain some discretion to enter findings and conclusions in appropriate cases, and that those judicial pronouncements are necessary here for several reasons.

■ First, Westinghouse contends that the entry of findings and conclusions is necessary to demonstrate to enforcement courts in other jurisdictions that the default judgment is valid and unassailable. Thus, Westinghouse says the findings will ensure foreign recognition by showing our jurisdiction to enter the judgments. *See Reynolds v. Stockton,* 140 U.S. 254, 11 S.Ct. 773, 35 L.Ed. 464 (1891). However, because these defendants defaulted by failing to appear, they may attack the resulting judgment collaterally on the basis of lack of jurisdiction over the person or the subject matter. *Pennoyer v. Neff,* 5 Otto 714, 95 U.S. 714, 24 L.Ed. 565 (1877). The entry of jurisdictional findings might undermine such an attack, but such findings could not preclude it.

■ Westinghouse also asserts that specific findings are necessary to establish that the default judgment is "responsive to the issues tendered by the pleadings," quoting *Reynolds, supra.* This argument also misses the mark. Westinghouse has only requested a default judgment as to liability. By definition, there can be no inconsistency between such a judgment and the pleadings, since a default necessarily has the effect of admitting all well-pleaded facts in the complaint relating to liability. *See* 10 Wright & Miller, *supra,* § 2688 at p. 282. Although pursuant to our earlier oral suggestion findings presently proposed by Westinghouse parse allegations containing conclusions of law and prejudicial references to non-defaulting defendants, we do not see this as a particularly constructive or useful effort. The entry of additional findings may actually have the opposite effect of creating such an inconsistency between the complaint and the judgment, because any paraphrasing, summation or restatement of the complaint poses a risk of misstatement or omission.

■ As the final leg of its foreign-recognition argument, Westinghouse says the findings are needed to assure that the default judgment cannot later be avoided as being "ambiguous," and that any relief which Westinghouse may request from another jurisdiction is justified by "the nature of the claim forming the basis for the judgment."[3] However, the ambiguity of the default judgment, as well as any findings in support thereof, rests entirely on whatever ambiguity is contained in the complaint itself. Similarly, the nature of the claim is also defined entirely by the pleadings. The complaint is the only judicial document which has been served upon the defaulters. It constitutes their sole basis for evaluating the scope of the action and for deciding whether or not to appear. Moreover, since a nonappearing party is not entitled to any notice of the entry of a default judgment, *see* Rule 55(b)(2) and *Gomes v. Williams,* 420 F.2d 1364 (10th Cir. 1970), additional findings and conclusions entered in support

---

**3.** Westinghouse cites *Henry v. Tofany,* 76 Misc.2d 330, 350 N.Y.S.2d 298, 300 (Sup.Ct. 1973) and *Hatch v. Hatch,* 247 Or. 588, 431 P.2d 832, 834 (1967) for these propositions.

of such a judgment will not necessarily supplement their understanding of the action. Consequently, specific findings of fact and conclusions of law cannot dispel any ambiguity nor add any clarity to the claims framed by the pleadings themselves.

Westinghouse's second major argument is that findings and conclusions are necessary to support the entry of subsequent relief orders against the defaulters. Westinghouse cites authority to the effect that an injunction order must be accompanied by appropriate findings. *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 813–14 (2d Cir. 1975). It also argues that specific findings will assist Westinghouse's preparation of damage and causation proofs tailored to the specific facts admitted by the defaulters and will expedite our analysis of the relevancy and sufficiency of those proofs. These arguments all focus on the need for findings to support relief orders. But Westinghouse has only requested a default judgment as to liability. Because a default does not constitute an admission of the amount of unliquidated damages or of the propriety of injunctive relief, a decision on those issues may require the development of additional evidence. We prefer to reserve the entry of findings for consideration at that stage of the litigation. At the present time, there are no controverted or voluminous facts to distill or resolve. The office of Rule 52(a) is not served by Westinghouse's request.[4]

■ Above and beyond the inadequacy of Westinghouse's showing of need for specific findings of fact and conclusions of law, there are additional considerations which would make it unwise for us to adopt this procedure. First, the entry of detailed findings as to the defaulting defendants increases the opportunities for inconsistent adjudications when the final judgments as to the remaining defendants are subse-

quently entered. Cognizant of the policies of the *Frow* decision which condemn such incongruous results, we believe that the best course is to limit the details of the default judgment to a bare minimum. Second, despite their revision, Westinghouse's proposed findings contain oblique references to the non-defaulting defendants. These references are a byproduct of Westinghouse's theory of a fairly cohesive and unitary conspiracy among all the defendants, and of the possibility of intercorporate connections and affiliations between some of the defaulting and non-defaulting defendants. While we have been fairly successful at refining the proposed findings to remove any possible prejudice to the appearing defendants (who, of course, are not bound by the default judgments), we find that the selective editing of all residual overlap occasionally has the effect of truncating and distorting the original allegations of the complaint. In some respects, the effect is similar to staging a play without including all the major characters—at some point not only the flow but also the plot of the story loses its authenticity.

For these reasons, Westinghouse's motion for entry of findings of fact and conclusions of law in support of the default judgments is denied.

A draft judgment will be entered in accord with the views expressed herein.

---

**4.** *See AR Inc. v. Electro-Voice, Inc.*, 311 F.2d 508, 513 (7th Cir. 1962). The court stated that "[w]here . . . no genuine material factual issue is presented it would be ill-advised to make specific findings and separate conclusions. They would carry an unwarranted implication that a fact question was presented."